## JOHN J. GOOD v. WILLIAM COOMBS ET AL.

The appellant brought suit for the recovery of an interest in a tract of land purchased by him at sheriff's sale, two hundred acres of which he admitted to be the homestead. The defendants and intervenors in their pleadings notified the plaintiff that they relied upon certain deeds, under which they claimed adversely to him. The plaintiff, although thus notified, omitted to

allege in his pleadings any invalidity in such deeds by reason of fraud or other cause. But, on the trial in the court below, the plaintiff was permitted, without objection, to introduce evidence impeaching the deeds for fraud; notwithstanding which, however, the issue thereon was found against him. This court, in view of the whole of the evidence taken together, and notwithstanding some suspicious circumstances, holds that the preponderance is in favor of the good faith of the deeds, and that the appellant, even if he had properly raised the issue by his pleadings, would have had no ground to complain of the judgment of the court below sustaining the deeds, and that he had the less right to complain, inasmuch as he had not made the issue in any mode entitling it to the consideration of the court.

There is no rule of law known to this court, by which the survivor of the conjugal partnership is prohibited from alienating his or her portion of the community estate, provided the alienation is in good faith, and not with intent to defraud creditors or the heirs of the deceased partner.

The right of the survivor of the conjugal partnership to make sales of community property would seem to be a necessary consequence of the obligation of such survivor to discharge the debts against the partnership, because it is usually by such means only that those debts can be paid.

One joint tenant or tenant in common cannot convey a distinct portion of the estate by metes and bounds, so as to prejudice his co-tenants. This is not an open question in this court.

It follows that a judgment creditor of such a tenant, having no greater right than the tenant himself, is not entitled to have a distinct portion of the common estate set apart by metes and bounds for the satisfaction of his judgment.

The plaintiff in his petition asked, in case the land sued for should not be adjudged to him, that a decree be rendered, annulling the levy and sale, and refunding to him the purchase-money he had paid. *Held*, that, inasmuch as the plaintiff in the execution was not a party to the suit, the application for such alternative relief could not be considered.

APPEAL from Dallas. The case was tried before B. WARREN STONE, Esq., a special judge chosen by the parties because of the interest of Hon. NAT. M. BURFORD, the presiding judge.

William Coombs was the head of a large family, consisting of wife and children. Induced by the offers of the *empresarios* of Peters' colony, he emigrated from Missouri to Texas, and, in October, 1843, he settled as a colonist on the six hundred and forty acre tract of land surveyed by the company, and fully described in the pleadings of

the parties and the statement of facts. According to the theory of Texas law, this was not a title of pure donation to the husband, but it was onerous and burdensome; and the land and all the fruits of the labor of the conjugal spouses resulted to the benefit of the community. (Paschal's Dig., Arts. 4641, 4642, Notes 1048, 1049.)

In their new home, William Coombs became a well-to-do man. But he seems to have left some old debts behind him. These followed him, and fell into the hands of a lawyer by the name of Eliot. These notes were seven in number, each for $500. This was a large debt for a poor man in the woods. They were payable to Seymour Stone. They seem all to have been barred by the Texas statute about contracts "grounded in writing," except two. For this, or some other reason, negotiations were had, which resulted in Coombs executing to Stone four new notes, dated the 31st March, 1849, each for $234, due at one, two, three, and four years. This arrangement with Eliot was subject to the approval of Stone, so that Eliot held both sets of notes, the one or the other set to be surrendered according to Stone's decision; no time to run after the new contract.

Before this decision, Coombs preferred the old large notes to the new small ones; those long over-due, with large interest, to those not yet matured, without interest. At any rate, Coombs went to Corsicana and demanded back his new notes. But Eliot was well satisfied with the less amount, and so, after a time, he returned Coombs his seven old notes.

But after these notes were given, and while they were running to maturity, many changes in the circumstances of William Coombs took place. On the 6th of July, 1847, his good wife, Mrs. Ivy Coombs, died, leaving several children, her husband, and her interest in the community property, encumbered with obligations to pay this community debt to Seymore Stone, if, indeed, the novation of an

old debt, contracted in another common-law country, was a community debt.

In October, 1848, the widower, William Coombs, consoled himself by marrying Rachel McDowell, a "young lady," who demanded "boot" for exchanging her charms for an old man, the father of half a dozen children, and a little embarrassed in fortune. The fond lover agreed to pay her $500, but it was objected that this agreement was verbal, and not solemnized by notarial contract, as required by our law. (Paschal's Dig., Art. 4632.) The conscientious husband kept his promise, and paid the money after marriage, but he afterwards borrowed it to. build a mill on his land, and he returned it from the profits of the mill.

He also, on the 5th of May, 1849, sold all his interest in the land in controversy to his son, Isaac N. Coombs. He only claimed to have sold an undivided half. Isaac N. Coombs, on the 19th November, 1850, conveyed what he bought to his step-mother, Rachel McDowell Coombs. He said she gave him that same $500 which the lady received as "boot," and a carriage and some cattle, which her father (McDowell) got for working on the mill.

Just what other considerations moved to these purchases will be told hereafter. On the 5th November, 1855, Seymore Stone obtained judgment against William Coombs upon his notes; and, under this execution, John J. Good became the purchaser of this same land and mill, by the sale and deed of the sheriff. But now, whatever other complications came in the way, all agreed that the said William Coombs and his family were protected under our liberal constitution to the extent of "two hundred acres in the country," as his homestead. (Paschal's Dig., p. 65, sec. 22, note 198.) How all these simple facts were worked into a legal wrangle, covering an immense record, the *Reporter* leaves to his predecessor, Mr. Jackson, to tell.

On the 1st of January, 1858, John J. Good, the appel-

lant, brought this suit against William Coombs and Rachel, his wife. In his petition, the plaintiff alleged, that on the 6th of November, 1855, one Seymore Stone recovered judgment against said William Coombs in the District Court of Dallas county for $895 53, besides costs of suit. That an original and an *alias* execution issued on this judgment, the latter of which, on the 6th of October, 1856, was levied by the sheriff on the southwest quarter of section 17, and the southeast quarter of section 18, all in township 1 south of the first base line, and range 1 east of the first meridian, of the surveys made in Peters' colony, containing three hundred and twenty acres, but reserving therefrom two hundred acres, to include the homestead of William Coombs, the defendant in the execution. That, on the first Tuesday of January, 1857, after legal notice, said land was sold by the sheriff to satisfy said execution, and plaintiff became the purchaser at the sum of $150, in consideration of which the sheriff made and delivered to plaintiff his deed for the land so levied upon and sold. That the said tracts adjoin each other, and the improvements of the said Coombs are on each of them. That plaintiff is entitled by said sale to one hundred and twenty acres out of said tracts, there being that quantity left after deducting the amount to which said Coombs is entitled as his homestead. That plaintiff has requested the said defendants, William and Rachel Coombs, to designate by metes and bounds the portion of said tracts claimed by them as their homestead, so that plaintiff might know the exact locality and metes and bounds of the land to which he is entitled by virtue of his purchase at said sale, but that the defendants neglect and refuse so to do. Wherefore plaintiff prays for partition of said land, setting apart to the defendants their homestead tract of two hundred acres, and to the plaintiff the one hundred and twenty acres to which he is entitled as aforesaid. In conclusion, the plaintiff prayed as follows:

" In the event petitioner is mistaken in the relief sought, he prays the court to grant him a judgment and decree annulling, canceling, and setting aside said levy and sale, and the refunding of the purchase-money paid by him, together with such other and further relief as, the premises considered, he is entitled to, and he will ever pray," &c.

The defendants excepted generally and specially; the defendant, William, disclaimed any interest in the land in controversy, and the defendant, Rachael, denied all the allegations of the petition, asserted exclusive title in herself to the whole of the land as her separate property, and denied that any portion of it was ever subject to sale under the execution referred to by the plaintiff.

On the 16th day of July, 1858, several other parties appeared in the character of intervenors. Some of them were the children and heirs of Isaac N. Coombs, a deceased son of the defendant, William Coombs, by his former wife, Ivy, now deceased, and the others were the children and heirs of the said Ivy herself. The intervenors represented in their petition that, in November, 1843, the defendant, William Coombs, and his then wife, Ivy, since deceased, emigrated to, and settled in, Peters' colony, as colonists, on the land in controversy in this suit; that according to the laws, &c., relating to said colony, the said William and Ivy were entitled, as a family, to six hundred and forty acres of land, by virtue of their emigration and settlement, and that said Ivy was entitled to three hundred and twenty acres of the said land; that afterwards, on the 6th day of July, 1847, the said Ivy Coombs departed this life intestate; and that, by reason thereof, the interveners, as her children and heirs, became entitled to her estate, and are the legal owners of one undivided half of the head-right of said William Coombs, consisting of the west half of section 17 and the east half section 18, in township 1 south, and range 1 east, in Peters' colony, which tracts comprise the land in controversy; that the land has never been par-

titioned between the said William Coombs and these inter-
venors, the heirs of the said Ivy Coombs, deceased; that, on
the 5th of May, 1849, after the death of said Ivy, the said
William Coombs conveyed the entire six hundred and forty
acres to Isaac N. Coombs, whereby the interests of these
heirs were attempted to be conveyed without authority of
law; that the deed of said William to said Isaac N. Coombs
conveyed in fact only an undivided half of said section of
land, that being the portion to which the said William was
entitled by law; that the purchase and sale pretended in
the plaintiff's petition was upon an execution issued upon
a judgment rendered against William Coombs alone, and
that the cause of action for which the judgment was ren-
dered accrued long after the death of Ivy Coombs, the
ancestress of these intervenors, and was one for which the
community property of said William and Ivy was not
liable, but that the separate property of William Coombs
was alone liable for such cause of action at the date of the
rendition of such judgment; that the plaintiff's purchase
was a nullity, and was a fraud upon the rights of inter-
venors, who charge, that at the execution sale the plaintiff
was fully notified of all the facts now set forth by inter-
venors, and was fully notified of their interests and rights;
that said pretended purchase and sale was also null and
void for uncertainty; that no particular land was described
or sold, and that the sale was forbidden by these interve-
nors; that these intervenors had not received any part of
the money or consideration paid by plaintiffs for said land,
nor has any part of it inured to their benefit; and that the
plaintiff was fully warned of the condition of the land and
of the claims existing to it, and that he purchased at his
own risk. Prayer for decree for one half of the section of
land, and for general relief.

The plaintiff amended his petition, replying that, on
the 24th of October, 1840, and during the lifetime of Ivy
Coombs, the said William Coombs, her then husband,

made, executed, and delivered to Seymore Stone, for value received, his seven promissory notes, for $500 each, due respectively on the 20th of September, in the years 1842, 1843, 1844, and 1845; that Ivy Coombs died in 1847, and no administration had ever been opened on her estate; that said William Coombs intermarried with his present wife, Rachel, one of the defendants; that on the 31st of March, 1849, William Coombs made, executed, and delivered, to the aforesaid Stone, his four other promissory notes, for $234 each, due at one, two, three, and four years, in lieu and in full of the seven notes first above mentioned; and that on the 6th of November, 1855, judgment was rendered on the said four notes against said William Coombs; that on the —— day of ———, 1844, said William Coombs, as a head of a family and a colonist of Peters' colony, settled upon and claimed six hundred and forty acres of land situated in said colony; that on the 1st of April, 1850, said William Coombs received, from the commissioner of said colony, a certificate for six hundred and forty acres, which was located on the land so settled as aforesaid; that letters patent issued therefor on the 16th of March, 1855; and that the land in controversy is part thereof. The premises considered, plaintiff prays as in his original petition.

The presiding judge having been of counsel, B. WARREN STONE, Esq., was agreed upon by the parties as special judge, and the cause was submitted to the court without a jury.

The case came to trial at the summer term, 1859. The general and special exceptions of the defendants were overruled.

It was admitted that the intervenors were the heirs, as alleged in their petition; that William Coombs and his wife Ivy emigrated to Texas, and settled as colonists of Peters' colony on the land, and at the date stated by intervenors; that Ivy Coombs died at the time alleged by them; that the land in controversy is part of the colonial head-

right section obtained by William Coombs as the head of a family; and that the intervenors had never received any part of the money or consideration paid by the plaintiff, Good, for the land claimed by him.

By the statement of facts, it appears that William Coombs continued to reside on the land after the death of his wife Ivy; that about the last of March, 1849, an agent of Seymore Stone called upon William Coombs with the seven notes for $500 each, mentioned by plaintiff in his amended petition, and a negotiation began between them for a compromise; the agent made inquiry of another person as to the prospects of William Coombs for making money and paying the notes, if indulgence were extended to him, and was told, in reply, that Coombs was doing well, and would be likely, if indulged, to meet any contract he would enter into; that, on the 31st of March, 1849, William Coombs executed the four notes for $234 each, to be in full of the seven notes aforesaid, provided Stone should sanction the arrangement, upon whose ratification it was to be final, and the agent was to cancel and surrender the seven notes. But if Stone did not consent to the arrangement, the four notes were to be surrendered. It was further agreed, that Coombs should not avail himself of the lapse of time while the arrangement was pending, "but that the original debts against him should stand and remain upon the same footing, with the same legal advantages, which the said Stone would possess if suit were now brought upon said seven notes." This agreement and arrangement were made in writing between Coombs and Stone's agent. The statement of facts represents, that "it was a year or two before Eliot (the agent) consulted Stone, and a year or two after that he sent the seven old notes to the said William Coombs. Some time after the said William Coombs had executed and delivered the said four notes and agreement to Eliot, he visited Eliot at Corsicana, and demanded of him the four notes, and expressed

his desire that Stone should retain the seven old notes, but to this Eliot would not consent, and retained the four new notes."

On the 5th of May, 1849, William Coombs conveyed by deed to Isaac N. Coombs all of his "right, title, claim, or interest," in and to the entire section of land, acknowledging in the deed the receipt of $1,000 as the consideration. According to the statement of facts, "at the date of said deed the said Isaac N. Coombs paid to the said William Coombs $100 of the consideration for which the land was sold, in cash, and settled an indebtedness of the said William Coombs to the said Isaac N. Coombs of items, running back to 1843, of $250. And the said William Coombs, being called by the plaintiff, testified that the full consideration for said land was paid to him by the said Isaac N. Coombs. The said Isaac N. Coombs, at the time of his said purchase of said land, knew all about the indebtedness of the said William Coombs to the said Seymore Stone. The said William Coombs was out of the possession of said land, after he sold it to the said Isaac N. Coombs, about one year. The said William Coombs only intended by his deed to the said Isaac N. Coombs to sell his undivided interest in the six hundred and forty acres of land, and it was understood between them that he was selling only an undivided half of said six hundred and forty acres."

In the fall of 1848, the defendant, William Coombs, married his present wife, Rachel, and they resided on the land up to the sale to Isaac N. Coombs, when it passed from their possession for "about a year." On the 19th of November, 1850, Isaac N. Coombs, for the expressed consideration of $800, executed to the defendant, Rachel Coombs, his deed, with special warranty, conveying to her all his "right, title, interest, and claim, of, in, and to" the southwest quarter of said section 17 and the southeast quarter of said section 18, being portions of the head-right section of

William and Ivy Coombs, and sold by William to Isaac N.
Coombs, who was his son.  " The said Rachel," according
to the statement of facts, "paid the consideration specified
in said deed for said land, in the following manner: "Be-
fore the marriage of her and the said William, the said
William being an elderly man, with several children, and
she a young lady, he agreed to give her $500 in cash to
marry him, or as boot between their circumstances.    This
sum he paid her after they were married.    Afterwards, in
erecting a mill, he borrowed the said $500 of the said
Rachel to assist in building and completing said mill.
The father of Rachel was a mechanic and mill-wright, and
worked on said mill.    In payment of his account, the said
William gave him stock and a carriage.    This property
the said father gave to the said Rachel by deed, executed
on the 5th day of May, 1849, which was on the same day
duly acknowledged and recorded.    At the purchase of the
said land by Rachel, the said William having realized
from the profits of said mill the said sum of $500, and dis-
posed of said property given to her by her father, he
replaced the said $500, borrowed as aforesaid for the pur-
pose of paying for said land, and with it and the proceeds
of said property she paid for said land."

The levy of the execution, under which plaintiff pur-
chased, was made upon the "southwest quarter of section
No. 17 and the southeast quarter of section No. 18," town-
ship and range as before stated.    The sale and the receipt
of the purchase-money from the plaintiff appeared by the
returns of the sheriff upon the execution.    At the time of
the levy, and ever since, the defendants, William and
Rachel Coombs, resided on the land, the whole six hun-
dred and forty acres of which were patented to William
Coombs on the 16th of March, 1855.

The court rendered judgment generally, that the plaintiff
take nothing by his suit, and that the defendants recover
of him their costs.    And further, that the intervenors re-

cover of the defendants and the plaintiff one-half of the entire section of land, and of the plaintiff all their costs.

The plaintiff moved for a new trial, because the judgment was contrary to the law and the evidence. The motion was overruled, and the plaintiff appealed.

*John J. Good,* for himself.—The judgment is erroneous because—

I. Appellant by his purchase is substituted to the rights of Seymore Stone, and whatever was a fraud on him can be set up by Good.

II. The deed from William to Isaac N. Coombs was conceived and brought forth in fraud of Stone's rights. The assignee knew of William's indebtedness; was his son; paid but $100, liquidating, by pretense, $250 more, due him by his father, running back several years; received the deed pending the agreement between Stone and William, and this but little more than one month after the latter. The consideration specified is $1,000; the amount paid, the paltry sum of $350.

III. The deed from Isaac N. to Rachel Coombs can be regarded in no other light than an effort to hide and cover up the fraud attempted to be perpetrated. The money was obtained from her husband after marriage: $500 under pretense of a marriage contract in direct violation of morality and propriety, contrary to public policy, (1 Story's Eq., §§ 260–65,) and in violation of law. (O. & W. Dig., Art. 1392.) The balance was not the identical money for which his wife's separate property was sold, but a sham or plausibility. Taken altogether, it was an "ambidextrous double-shuffling between husband and wife," with the assistance of a son.

The defense of the intervenors was, that the last four notes were a novation of the first seven, and the arrangement having been effected after Ivy's death, they were no longer a claim against the community. Their defense is

entitled to some respect, but we think the following propositions are conclusive of its error:

1. To constitute a novation, there must be a substitution of a new obligation, a new creditor or a new debtor. (Hobson v. Davidson, 8 Mart. La. R., 431; Glasgow v. Stephenson, 6 N. S. La. R., 568; Rosman v. Zabriskie, 4 Rob. La. R., 493; 1 Pothier on Obligations, 441.)

2. Novations will not be presumed. (Jacobs v. Caldwell, 4 La. Ann. R., 509; Lalande v. Breaux, 5 Id., 249; Short v. New Orleans, 4 Id., 241; Goldscmidt v. New Orleans, 5 Id., 436.)

3. Common property descends to the heirs-at-law, subject to the payment of community debts.

4. On the death of Ivy, William, as the survivor of the connubial partnership, had the right to control, manage, and dispose of the common property for the payment of community debts.

5. If he fail, neglect, or refuse so to do, the same may be sold under execution for that purpose.

*John M. Crockett,* for the appellees, William and Rachel Coombs. — The first question in this case is, is the sale to Isaac N. Coombs tinctured with fraud on account of the indebtedness of William at the time of the sale? We think that the evidence will not warrant such a conclusion. (See McQuennay v. Hitchcock, 8 Tex., 33; Edrington v. Rogers, 15 Tex., 195; Hancock v. Horan, Ib., 511.)

The next question is, was the land, when purchased by Rachel, the community estate of her and the said William? We think the circumstances negative this proposition also. It was purchased partly with means brought by her into the marriage, and the balance with the proceeds of a gift from her father. It is true that these are all family arrangements, but they wear no badge of an improper design. Rachel could be cognizant of no wrong in her contract for a marriage settlement, and the sum

stipulated was paid to her, and that very means is traced distinctly into the purchase of the land, as is also the proceeds of her gift.   (Chapman v. Allen, 15 Tex., 278;  Love v. Robertson, 7 Tex., 6;  Rose v. Houston, 11 Tex., 324.)

Rachel is not charged with, nor can she be presumed to have notice of, the debts of William.

William was not in failing circumstances at the time of the transactions.   The facts justify the belief that he had once failed, and that his creditors were speculating upon the chances of his success.   (Reynolds v. Lansford, 16 Tex., 286.)

*E. P. Nicholson*, for the intervenors.—Appellant avers in his amended petition "that the new notes were given in full satisfaction of the old ones, and the old notes were given up."

Here is a contract, by which not only the old notes were discharged, but all the collateral engagements connected with them.   If the land which descended to Ivy's heirs (to wit, an undivided half section) was bound for the payment of the old notes, it will not be bound for the payment of the new ones.   (1 Bouv. Inst., p. 310, § 801.)

The facts constituting the novation are not only admitted by appellant in his amended petition, but they are fully and satisfactorily set forth in the statement of facts.

The act of Stone's agent, when considered, I think, shows a novation.   He made inquiry as to the prospects of said William for making money, and received in answer, that William was now doing well, and, if indulged, would be likely to meet any contract he might enter into.   William alone was trusted, and the property of Ivy's heirs is not bound for that debt.

The fact that, two years after the wife Ivy died, and after descent cast, Stone surrendered the only evidence he had of a claim against the community, if it does not amount to a novation, shows at least his intention to trust William

alone, and not to rely upon any community property for its discharge. Stone never had any lien upon the community, and the community was liable only so long as there was a subsisting claim against it. We submit that it cannot be said that there was a subsisting claim against it after the surrender and cancellation of the old notes, under the facts of this case.

Another consideration why this judgment should not be reversed is, that Good acquired no right under the sheriff's sale. The levy was bad. If the land were community property, (which is admitted,) the interest of Ivy's heirs to an undivided half of the section pervaded the whole section. No particular fraction of that section belonged to any one of those interested, for it was undivided. Yet the sheriff (no doubt by the direction of Good, for he was Stone's attorney) levied upon two certain quarters of that section. Was that the interest of William alone, or were not Ivy's heirs interested in it? Whether Good could hold what he bought or not would depend upon future conditions, that is, whether, in a partition, the particular land sold would fall to him. (Dougherty v. Cox, 13 Tex., 209.)

The sheriff should have levied upon and sold only the right, title, and interest which William Coombs had in the land. He had no right to sell any part of that section by metes and bounds.

Had he sold only William's interest, then Good would have become a joint tenant with the others interested, and upon partition his share would have been set apart to him. (Moody v. Payne, 2 Johns. Ch., 548.)

COKE, J.—The intervenors and defendants are satisfied with the judgment of the District Court. The appellant, Good, alone seeks a reversal of that judgment.

We will consider such questions only arising on the record as are necessary to the adjudication of the case as to him.

No question is made of the fact, that the land in controversy is a part of the community estate of William Coombs and his former wife, Ivy. This is admitted by all the parties.

The first question arising for consideration is as to the validity of the deed from William Coombs to Isaac N. Coombs, and its efficacy to transfer the land therein described, or his interest in it.

The appellant, in his argument, attacks this deed, as also that from Isaac N. to Rachel Coombs, as fraudulent, and charges that they were made in pursuance of an arrangement between those parties, entered into for the purpose of defeating the collection of the debt due Stone.

There is no allegation of fraud, unfairness, or other cause of invalidity, made in appellant's pleadings against these deeds or either of them, although he had notice from the pleadings, both of the defendants and intervenors, that they would be relied on against him.

Yet, it seems that in the court below evidence was admitted without objection for the purpose of proving fraud; and, on the proof, the issue was there found against the appellant.

If that issue had been properly presented by the pleadings, while there are some circumstances in proof which may by regarded as suspicious, we think the whole testimony, taken together, preponderates greatly in favor of the good faith of the transaction, and that the appellant would have had no just ground to complain of the judgment of the court below sustaining it. Still less right has he to complain, when he did not make the issue in any mode entitling it to the consideration of the court. (Fort v. McKenny, 10 Tex., 220.)

We are aware of no rule of law which prohibits the alienation by the survivor of the conjugal partnership of his portion of the community estate, when the same is done in good faith, and with no intent to defraud creditors or the heirs of the deceased partner.

4—XXVIII

The right to make sales of the community property would seem to be a necessary consequence of his obligation as survivor to discharge the debts against the partnership, because, usually, it is only by that means that these debts can be paid. (Jones v. Jones, 15 Tex., 147.)

We believe it clear, that the deed in question passes the title of Wm. Coombs to the land of the grantee, Isaac N. Coombs.

The next question arises upon the deed from Isaac N. Coombs to Rachel Coombs, which purports to convey a defined and designated portion of a tract of land held by the said Isaac N. Coombs, in common with a number of other joint tenants. Is it operative and valid or not to convey the land?

We think clearly not. That it is inoperative and void, for all the purposes for which it can be considered here, we have no doubt. (See authorities cited hereafter.)

By the deed from William to Isaac N. Coombs, the grantee acquired title to an undivided half of the six hundred and forty acre tract of land in question, which descended at his death (the date of which occurrence is not shown by the record) to his heirs. [The death of the wife and her heirs must be meant by the judge.— *Reporter.*] The remaining undivided half of said tract of land was held by the intervenors, who are the heirs of Ivy Coombs, deceased.

Upon the defined and designated portion of this land, thus held and owned in common, the execution issued on the judgment in favor of Stone against William Coombs, who levied; the same was sold; and Good, the appellant, became the purchaser at the sheriff's sale.

The rights of the appellant, whatever they may be, accrued to him by virtue of this purchase.

The question then arises as to the legal effect of this levy and sale. Does it operate, together with the sheriff's deed to appellant, to vest in him the title to the land claimed,

or any part of it? We are of the opinion that it does not.

That one joint tenant or tenant in common cannot convey a distinct portion of the estate by metes and bounds, so as to prejudice his co-tenants, is not an open question in this court. (Stewart v. Baker, 17 Tex., 417; McKey v. Welch, 22 Tex., 396; Dorn v. Dunham, 24 Tex., 376.)

In the case of McKey v. Welch, Chief Justice WHEELER, delivering the opinion of the court, says:

"It appears to be well settled, and upon good reasons, that one joint tenant or tenant in common cannot convey a distinct portion of the estate by metes and bounds; for to give effect to such alienations, as against the co-tenants of the grantor, would be to create new tenancies in common to the injury of the co-tenants. As one tenant in common has no right on partition to select any particular portion of the land, and insist on having his part set off in that specified portion, so he cannot convey such a right to his grantee;" and in support of the position cites numerous authorities.

The same process of reasoning is conclusive against the right of the judgment creditor to have set apart, for the satisfaction of his debt, a distinct portion of the common estate by metes and bounds, for certainly he has no higher right in or greater power over the property than the debtor, and is equally bound to respect the rights of the other joint tenants. And so it has been repeatedly held. (3 Vt., 394; 9 Vt., 138; 12 N. H., 563; 2 Conn., 244; 24 Maine, 308; Bartlett v. Haldon, 12 Mass., 348; Barnum v. Abbott, Ib., 474.)

This view of the case disposes of it without the necessity of considering the other questions raised by the appellant, as to whether Stone's judgment is a debt against the community estate of William and Ivy Coombs, and as to whether the community property is liable to be sold under

this execution against William Coombs, without any proceedings against the heirs of Ivy.

It would have been otherwise had a certain portion or the whole of the community interest in the entire tract of land been levied on and sold.

The appellant, in his pleadings, asks that, if he is not entitled to the land claimed, a decree be rendered annulling and setting aside the levy and sale, and refunding the money paid by him to the sheriff for the land; a proposition which it is believed the court below could not properly consider, without first having Stone, the plaintiff in execution, a party before the court, and he was not a party to the suit.

Upon the whole, we are of the opinion, that there is no error in the judgment of the court below of which the appellant can justly complain; and that it should be

AFFIRMED.